We'll now hear the K.D. case. One second. People coming in and out. Go ahead, Counsel. Thank you, Your Honor. Good afternoon. My name is Katherine Reisman and I'm here today with my colleague Sarah Zuba and we're proudly representing K.D. and her parents in this appeal. I'd like to request two minutes for rebuttal. Very well. Go ahead. Thank you. As the District Court recognized in footnote two of its opinion, this case does not involve factual disputes. It involves application of the law to undisputed facts. All right. Well, then tell me this. What's the practical or theoretical difference between our own jurisprudence's meaningful educational benefit and Andrew F.'s standard of whether an IEP is reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances? Do you see a either practical or theoretical difference between the two? I think our argument is that meaningful benefit could be a shorthand for a correct application of the Andrew F. standard. But what it can't be is you can't say something's meaningful benefit if it doesn't meet the Andrew F. standard. And in this case, it's our position that although the hearing officer used the words meaningful benefit, what he said was that meant more than de minimis progress. And when you look at the record, the undisputed facts in this case, the progress was barely more than de minimis. So my concern is that your briefs seem to focus on the outcome. And hindsight is 20-20, and parents also aspire to have the kids progress at a grade-appropriate level. But we're not talking about a child who's fully integrated in the classroom. We're not talking about a child as to whom Andrew F. said there could be a presumption that this child would move in tandem with the other first, second, third graders. We're talking about someone with serious hurdles. And so reasonably calculated to make the progress doesn't mean keeping up with the other kids who are at the same age. And your formulations seem to flirt with the idea that because some of the standards, she hit some benchmarks, some of the benchmarks were the best aspirations you could hope for the next year over, that that meant that she wasn't getting a meaningful education benefit just because she didn't wind up making full grade progress. Your Honor, our argument is that the IEPs did not attempt to close the gap between KD and her peers. The undisputed facts in this case... Is that a touchstone, comparing KD to her peers, or is it taking the individual unique circumstances of the child into consideration when you're doing the prospective IEP? It is taking the individual unique circumstances of the child into consideration, but that means looking at her potential for growth as well as her disability. But is it tethered to her peers? Excuse me, Your Honor? Is it tethered to the progression of... No, it's not, Your Honor. I misspoke. It's tethered to what is her potential for growth. And everyone agreed that KD had significant potential for growth. Both the school psychologist and the neuropsychologist agreed that KD had average to above average skills in certain areas. Because she was severely deficient in reading. Well, here's what I don't understand. In the district court opinion, the district court recites test results that over the period of time we're talking about, kindergarten to third grade, there is progress in test results. Anecdotally, you have a teacher's assessment in there that KD is making progress. The IEP also reflects that over time the district is attempting different reading programs all in an attempt to have KD, as I understand it, achieve to her full potential, but certainly willing to try new things. And also... Also, over the course of time, they were willing to have a one-on-one aid. I understand what the parents said with regard to the one-on-one aid. But certainly the suggestion of a one-on-one aid when there's, you know, pull-out time as opposed to a general ed time is an attempt to help KD make progress. So why is the district court wrong in its assessment that those are all indicia of the district trying to help KD achieve progress? The hearing officer and the district court found as a fact that the IEP goals had continued mostly unchanged throughout the time that KD was in the district. They also found as a fact that this programming was substantively unchanged. Those are findings of fact, and they're cited in our brief. The programming was changed from... Just one second. I'm sorry, Your Honor. What are you referring to when you say program is unchanged? Because I presume that if one of her deficits or one of her areas for growth, let's call it that, is reading, and if they're trying different reading programs to help her achieve, that's not making things stay the same or static. Well, Your Honor, what they changed at all times while in Downingtown, what KD had in her area of need and reading was a combination of a general education curriculum with some parts of a special education curriculum. They did change the types of special education curriculum, but they never provided more intensity of services in terms of the amount of time of special education instruction that she received. Did you agree they tried at least three different reading protocols? They tried three different reading programs, a combination of general education and special education, and in 2014 they had input from the parents' expert that said what she needs to make progress commensurate with her potential is a specialized school where she can get instruction in reading throughout the day, access to the text throughout the day. She needs that to address her potential for growth and to make appropriate progress. One of the challenges here is the parents suspect for at least a year that she has dyslexia  and you're not alleging that it was the responsibility of the school to do the testing, and so if the school is basing this on a child with one set of abilities and then the parents are responsible for delaying discovering that there's a different problem that might address differently, I don't see you can put that on the school. Well, Your Honor, the way the statute works, it is the school's responsibility to identify her needs, and they did identify her as a child with a specific learning disability in reading, so they knew that she had that need. I'm so sorry, but you just said a moment ago that the parents identified what she needed, and that was private school, and it's certainly possible that private school was better, but I thought what we were focused on is what did the district do from K-3, and while the district court did say some things remained unchanged in the IEP, certainly some things did not, and substantive things, which are recited in the opinion, which I don't need to recite now, is it your point that the deficit and what the district did that requires us to reverse is that they were too static in their recommendations? I'm not understanding. Yes. What is it that happened that cries out for reversal? Yes, they were too static in their recommendations. This court in GL and the Supreme Court in Andrew F. both recognized that school officials are making decisions of critical importance to children with disabilities when they do their educational programming. Andrew F. also says the nature of the IEP process involves consultation with the parents, and the parents worked closely with the school through those three years, and again I go back to those findings of fact of the hearing officer that said that the program was mainly substantively unchanged in goals and in programming for the entire time she was in the district. In addition, just to address the point on progress, the progress that the district court cited was, first of all, they cited performance on achievement testing, on cognitive testing, which is her IQ. That's not evidence of academic progress. That's evidence of potential for growth. She did have a good IQ, average abilities in non-reading areas. Should we set that aside? Are you saying it shouldn't be considered? Well, the cognitive testing is her IQ, which should remain static. The achievement testing that he relied on was in her areas of strength, picture vocabulary, and there was another, oral comprehension, which always were areas of strength for her. And he sets aside, he says she did worse in some areas. Well, she did worse in all areas where she essentially regressed in all areas, because when you look at the hearing officer's opinion, he explains that on the norm reference testing, when you look at, if her standard score is 78, which is below average, if she remains at 78 three years later, that's actually regression, because it means the gap is growing between her and her peers. And I understand that NGREF says we don't go on outcomes, but in this case what we're saying is that the special education and related services and programming was, it says in the decision, they were not aiming to do anything more than address foundational skills. And I think there are two issues. One issue is whether in the past the programming from 2012 to 2014 was sufficient, because there's a compensatory education claim for that. But there's another issue, which is in 2014, when the parents go to the school district with the report from Dr. Kelly that says she needs this private school, and Dr. Kelly testified about why she needed the private school, how they can provide access to literacy throughout the day, because all of the teachers are certified in specially designed instruction for reading, and they can provide level text for her throughout the day and give her the exposure to text that she needs. At that point in time, we're not faulting the school district for not providing her with that private school prior to that point, but at that point in time when Dr. Kelly comes in and says she needs this, the research shows that students like K.D. who receive this intensive and appropriate remediation can really make great strides. And I think the brief of the Enrique Copa and Education Law Center National Center of Children with Learning Disabilities talks about all the research about how these students do have potential to make significant progress in reading. Counselor, so I think the nub of your disagreement is addressed in the district court's opinion, pages 18 to 23, 24. Between the first and second IEPs, the school district had specifically designed instruction, wasn't in the first one. There's two and a half hours of evidence-based multisensory reading and writing. There's direct instruction for every day for multiple hours of reading that was not there in the first IEP. There's a new STI for math, direct instruction. So I think you've overstated that there weren't enough changes, and you have a doctor coming in later saying that more might be desirable, but I think the district court's opinion was pretty thorough in talking about this girl having so many deficits that the kind of repetition that was needed at very low levels was, in fact, what she needed, letter naming fluency and sounds. There's these fundamental things that have to be built on. So I have a hard time seeing this pretty detailed engagement with the IEPs saying that the district court or the hearing officer was just rubber stamping. Why is it that that's nevertheless inadequate? May I respond? Oh, don't worry about that red light. You're going to be here a while. Okay. Oh, good. The hearing officer himself said that the program was substantively unchanged. In addition, they were making changes, but they weren't providing more intensity, and they weren't providing ñ she did need to work on foundational skills. But if you look in the record, after four months at the AIM Academy, which is the private school for students with learning disabilities, in word attack, which is one of the foundational skills that the school district was working on, she went from a standard score of 81, which is below average, and at the first grade level, 1.5, to a standard score of 93, which is average, and a grade level of 2.8. So after four months of the intensive instruction that Dr. Kelly said she needed, she had gone up 1.3. She had increased almost as much as she had the whole time she was in the school district. When you speak to this notion of intensity, as I understood it, and if I'm wrong, please correct me, her day at the public school was essentially half general ed and half pullout. Is that roughly correct? That is correct, but in the pullout setting, she was not receiving only a special education curriculum in that setting. She was receiving some general education curriculum and some special education curriculum. So if I hear you right, one of the results of the analysis that we do here is if parents come to the conclusion that a private setting would provide either the same or some increased opportunity for their child, then that private setting should be what's provided. I believe, Your Honor, I would say that if parents provide to the school district and to the hearing officer evidence that the private setting can provide her with progress appropriate in light of her intellectual potential or in light of her potential for growth, and the public school setting cannot, then the parents are entitled to reimbursement for the private school setting. But here's the question that I have right off of that point. As I understood it, when Dr. Kelly came on the scene, if you will, came in, did her work, and then produced the report, the school district was not recalcitrant to recalibrate the time allocation, were they? They weren't recalcitrant to recalibrate the time allocation, and they also did their own reevaluation at that point. But at that point, Dr. Kelly made very detailed recommendations, and they never provide, and the research supports Dr. Kelly's recommendations, that a student like K.D. can make more progress in reading than she did, that that programming was not appropriate in light of her potential for growth. And there was never a response to the fact that, you know, Dr. Kelly said to them, at a school like AIM, they can provide her access to text throughout the day, which is what she needs at this point. There was no response to the fact that she had become so deficited because of the programming prior that she really needed this intensity of instruction. And it's not true that every time a parent's expert says a student needs a private school, that that's going to be what has to happen. But in this case, and when I said that the programming was substantively unchanged, that's a quote from the hearing officer's finding of fact. It was in the main substantively unchanged. They did change up the programming, but they didn't change the goals. They had her carry on with the same goals for several years with incremental progress in objectives. And if you look at the Andrew F. case on remand, that's exactly what the district court in Andrew F. on remand said in that case, what met the de minimis standard but didn't meet the standard that the Supreme Court set out in Andrew F., which is continuing the same goals year after year. This is not a student who should have been given up on. But subsequently, this case is different than the students in Andrew F. And that's part of the point of the Andrew F. decision, is that all of these students are going to be different. The student in Andrew F. had a different set of challenges. But the fact remains that in her areas of need, K.D. did not make meaningful progress in light of her intellectual potential, which was the standard pre-Andrew F. And it's my position that what Andrew F. did was, instead of using adjectives like meaningful or some educational benefit, it said you have to look at these things. And the things are the present level of achievement, the disability, and the potential for growth. The IEP has to take that into account. You also have to look at whether the school district complied with 1414 and made course corrections when provided with evidence, changed evidence, or provided with information from the parents or when provided with information showing a lack of progress. My understanding of the record, and correct me if I'm wrong, is the only time that the district didn't comply or similarly conclude that the manner of progress was appropriate was when Dr. Kelly came in and Dr. Kelly did her work and produced her report. And at that point, the view of the district and the parents diverged, but not before, as I understood it. Before Dr. Kelly's report, the parents were relying upon the school district to propose appropriate programming, and they didn't have any evidence that the programming was not appropriate. They're not professionals. When Dr. Kelly came in, there were two points to remember about when Dr. Kelly came in. The first point is in December of 2014. Dr. Kelly's report was July 2014. Then the school district made more changes to the programming in the fall of 2014 and did its own re-evaluation. In December of 2014, after seeing the changes, the parents said, we still think this isn't intense enough, and they made the unilateral placement. So at that point in time, there's a clear divergence in what the parents want and what the school's providing. The second point is in May of 2015, when the parents come back and they share with Downingtown the report from Dr. Kelly from May of 2015, which is the last item in the joint appendix. And what that says is that she started to make some really big progress on these foundational goals that they've been working on for three years. And at that point in time, Downingtown did not convene an IEP meeting. What 1414 says, that's new information from the parents. They're supposed to do something to respond to that. Instead, they just said, we're resting on the same IEP we offered before. And I think that that runs afoul of Andrew F., which says you have to comply with all of the parts of 1414. And they're not just procedural. Those are substantive requirements. Okay, excuse me. We'll get you a rebuttal. Thank you, Your Honor. Of course. Good afternoon, Your Honors. I'm Carl Romberger, Counsel for Appellee, Downingtown Area School District. When I consult with my clients and we prepare for this hearing, this hearing and any other ones, the questions that we're concerned with is the reasonably calculated side. I ask them, the question is, what did you do? What did you do, psychologist? What did you do, teacher? Did you take the data? Did you analyze the data and did you react to the data? That's what the law requires. We're talking a lot about the meaningful benefits side, and the outcome is not the touchstone of liability. The reasonably calculated side of the phrase is because that's the thing that the law says, school district, in all these prescriptive parts of the statute, you can control these things. And we can read the Third Circuit's cases and the district court cases and cases everywhere. Liability follows when the school district, either through negligence or even worse, just doesn't react. Now, we know, we all know, K.D. did not make the progress that everyone would have hoped she made. We know that. I feel like you're about to enter into sermon or summation mode, so I figured it's time to chat a little bit. Excellent. So let's focus on the time period that your adversary was just focusing on. Okay. So that would be the July of 14, December of 14, and May of 15, or thereabouts. I could be off by a month or so here or there, but I think I have it. You know, Dr. Kelly comes, does the work. There apparently is not an agreement on either what needs to be done in district. And K.D. is removed, and then there's the progress report about what's happened in the new placement. So before we get to the new placement, you know, that is what it is. Upon Dr. Kelly's entering onto the scene, if you will, tell me what the school district did at that point, and then maybe that could frame our discussion. Sure. So at this point, if I have my timeline correct, K.D. is at the beginning of her third grade year, so it's fall or whatever year that is. And at this point in the testimony, you will see the teacher's discussion, discussing that they were already considering yet another change to her program. Dr. Kelly's first report comes in. That report recommends abandoning the program. So in that sense, it's stronger words, but it's the same effect of what the school district folks are considering when they look at their data. The school district issues a permission to reevaluate, to consider Dr. Kelly's report. That's where Jodi Kniff, the school psychologist, report subsequently issued, and I put a lot of her testimony in the brief because it's very important to describe K.D.'s global functioning. The team meets to develop a new IEP. At this point, the downtown area school district recommends changing to a third program, SRA reading, SRA reading slash corrective reading I think is what it's called, and in addition adding Fast Forward, which is a computer-based phonetic program to help, as I understand it, train the ear to help stimulate the brain activity to be able to do the things that K.D. was not yet acquiring, that letter-sound relationship, morphine-level word reading, and so forth. At that point, the parties disagree. The parents, they receive the NORAP, the notice, and they reject it and request the hearing. They go off to the private school, and then the next step, as counsel alluded to and you mentioned, is the updated report telling the school district how K.D. was doing in her new private school, and it says what it says. As I understand the claim that is being presented is that the notice from parents was to say, we are considering coming back to the public school, and we want an offer of a fate. Now, I just reread that notice a couple days ago in preparation for this argument. That's not what the notice says. The notice is a clean 10-day notice under the statute. The statute requires when parents are considering private placement and wanting public funding and reimbursement for that placement, they have to give us this notice that says, we're privately placing her, and we want reimbursement. And the notice in the record says, we're privately placing her, we want reimbursement. It doesn't say we want your ESY program. It doesn't say we want to consider a new program with you, in which case, of course, we would have developed a new program. And I believe, it's not cited in the materials, but I believe the case out of the Eastern District, Gregory R., the Pendelco School District, stands for this idea that when parents remove their child unilaterally, they have essentially walked away from the fate, and they have to come and tell the school district, well, we're coming back, we'd like to see what you can offer us. I think that's also been consistent in district courts. There's a middle district court case that comes in the same sense. The argument here isn't that there's some procedural deficiency in how they proceeded, right? I mean, the focus is on the substance, and the question really is as we look at the cases that we're bound by, our own jurisprudence, meaningful educational benefit, and then Andrew F., and we look at the period of time, kindergarten to third grade, right, do those IEPs chart the progress, or let's see now, were they reasonably calculated to enable K.D. to make progress appropriate in light of her circumstances? Look, the district court clearly says that it did, and that's kind of where the rubber's hitting the road. Clearly the argument from your adversary is that that's not happening. Maybe you can focus on the substance of the IEPs. One of the arguments she makes is there's no progress noted in the IEPs, and there's no change. And, you know, obviously the briefs focus on grade level advancement and so forth, so that would be helpful if you would focus on that. True, and I think both the hearing officer and Judge Stengel in the court below reiterated the finding that there was change. We understand it's incremental, but in light of that unique circumstances component of the child, this child is learning letter-sound relationship. You can't just skip that and go to the next thing when you're learning to read, and that's what the teachers explained at the hearing, giving the cogent explanations. So it is true. Everyone agrees that the progress was less than satisfactory. The issue is Downingtown reacted to it to try to enhance her progress. We're not holding her back. We're trying with a more intensive program, going from a project read, which is a specialized curriculum, but it's the more closer to the less intensive side of things, going to Wilson Fundamentals, which is an intervention designed by Wilson Reading System for children in grades one through three, and then ultimately to the corrective reading program, which was described in the record as addressing both the phonics and the reading comprehension. And globally, let's not ignore the global finding about progress. The district court, toward the end of its decision, speaks of just the growth she made because the teachers described in their testimony and the IEPs and the findings of fact show the school district was using accommodations and other modifications to engage KD in science and the social studies and the other core classes as well as the specials through adaptive reading, through accommodations that could have been, not that they do much intense reading in the primary levels, but through other means, not just sitting down and reading, but reading it to her, making sure she understands it. There are other ways for a reading-deficited child to obtain benefit through these other things that are also part of the education, as the Supreme Court reminded us. Would you agree with the proposition that I think your adversary would put forth, and that is that if there isn't progress by the IEPs in the form that they took over time, that that is a failure to provide a favor? Would you agree with that proposition? With a caveat that if that progress was just, well, we'll do it again and she'll get it next year. That would be a denial of faith. But if it's a considered analysis of what's going on with her, considering her strengths, her weaknesses, as well as the other obstacles to her learning. KD has multiple deficits. She has the visual impairments. She has the attentional issues. And Jodi kind of described how that all exhausts her brain when she's trying to read. So what if anything you would make of counsel's argument that she did very well when she left the school? Not very well, but she made significant improvement. I would say, well, then that was yet another attempt at a program. Who knows? SRA Corrective Reading may have obtained those results for her. I don't know what the program is at the private school. Presumably it's another one of these direct instruction sequential phonetic structured multisensory programs. That's what SRA Corrective Reading is. Let me just ask you a follow-up on that very point. Sure. So in the last instance, if you will, just before they left, the form that the IEP took at that moment in time, right, Dr. Kelly's done her work, right, now there's a divergence of views. We should take her to private school. No, you can keep her here, right, at that point in time? Did the IEP at that time, is that when the SRA was suggested? What was the suggestion? Yes. Specifically, right, of the district at the time that Dr. Kelly came on the scene, did her work? I think it was December 2014. The proposal was the SRA Corrective Reading. It was 45 minutes of comprehension instruction, 45 minutes of phonetic instruction. That would be small group to one-to-one. It would be a direct instruction. It is based as all these other programs, you know, phonetic structured sequential, Gillingham-type based things. In addition to 30 minutes, these are per day, of the fast-forward program, which, as I described earlier today. So it was still a roughly 50-50 split between special ed and general ed? My recollection is her special education consisted of English language arts and reading and math. The other things would be regular ed. Okay. If I may, one point I would like to make is I want to talk about potential, because that is the word that's long been used in this circuit, and I urge that potential, it can be fraught with many different layers of meaning. When we're looking at the claim that average IQ should mean average growth, or that the IEP must aim for an outcome related to potential, that puts at risk Christopher Polk and all the others that this court has said. You need to make an earnest effort, even for those at the far end of the potential spectrum. One of the briefs of the amici said the following. The IEP was, they were quoting Andrew F., the IEP was not appropriately ambitious because it did not give, in that case him, in this case her, the chance to meet the challenging objectives under particular circumstances. Specifically, the IEP proposed by the district was not reasonably calculated to achieve academic success, attain self-sufficiency, and have other opportunities. So with that as a framework for discussion, how is what the school district here appropriately ambitious, and how did it, I mean you've gone through some of that already, but I guess the confusion I have is the appropriately ambitious seems to be aspirational, right? And so how do we grasp both the on-the-ground facts and still capture this aspirational notion? Sure, and the on-the-ground facts accumulate over time, and as the school has more experience with the student, we might expect a more analytical aspect of the reasonably calculated, so we know that she's still struggling to learn those fundamental skills, despite the instruction in reading fundamentals and so forth. She's still struggling. So we can't carve out an average cognitive ability from the evidence and facts on the ground. So the school district increased intensity, increased the duration, and the nature of the program. And so I think we get back to what did we do? We didn't ignore K.D.'s struggles. You read the testimony, it's pretty compelling. It's people who cared, and they tried, and they kept giving different approaches. They evaluated and understood her. It's not just the cognitive potential. That testimony from Jodi Kunniff is very compelling, and I think that forms the ambition. I appreciate it. Thank you so much. Thank you. We'll have your honor, Rebonna. Thank you. With respect to the argument about the Christopher Polks of the world, looking at potential for growth does not leave them out in the cold, any more than it left Andrew F. out in the cold. Every child is going to have potential for growth in certain areas. And the Christopher Polks of the world are going to be just as well served, just as Andrew F. was, because he wouldn't have had the same potential as someone like K.D., but he had potential in areas, and what the court said is you have to look at that. The other thing that I just wanted to reiterate is in this court, and N.C. said by definition educational programming that failed to achieve the enumerated goals in the past does not constitute a program likely to result in progress. Can I just ask you a question about that now? You said that the IEP was static over this period of time, but let's just focus on the period of time your adversary just focused on, and that is post-Dr. Kelly's involvement. The suggestions made for change by the school district, are you saying that despite those suggestions and despite the additions of programming of time, that that in essence amounted to the same despite the fact that it was not literally the same? Yes, Your Honor, because the amount of time per day that she was in the special education instruction was the same. So there was no addition of time? There was no addition of time. I do not believe the record reflects that there was an addition of time. There was a change in programming, and if you read the testimony regarding this, there were issues about whether there was anyone trained to even implement that program, but those are facts. What I want to focus on is what Dr. Kelly said she needed to make progress appropriate with her potential was a program, and this is in Dr. Kelly's testimony, where she would have access to text throughout the day, and that can be done with a student like KD when you, in the content area subjects, you can provide them with level text that is at a level where they can read, because one of the things Dr. Kelly says is KD, more than anyone else, needs to be accessing text and reading. That's part of the way that you're going to remediate her disability, and that can be done when the content area classes are in a small setting and when there are teachers that are trained in the special education reading programs. Not every student with a specific learning disability in reading is going to need a private school, but I think the evidence in this case is that KD did. I think the evidence in this case is that the changes to the programming were maybe changes in brand names and mixing different general education programs with different special education programs, but they weren't increasing the intensity of the programming. And again, the hearing officer noted that the programming was substantially unchanged. In addition, foundations itself is not a special education program. I just wanted to point that out. Thank you very much. Thank you, Your Honor. Thank you both for your arguments. We'll take the matter under advisement, and we'll take a brief break.